UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

ROBERT GROF,

                                    Plaintiff,                  9:24-cv-402 (BKS/TWD)

v.

DAVID DINELLO and SHEHAB ZAKI,

                                    Defendants.

_____

**Appearances:**

*For Plaintiff*:
Amy Jane Agnew
Joshua L. Morrison
Agnew & Morrison, P.C.
24 Fifth Avenue, Suite 1701
New York, New York 10011

*For Defendant Dinello*:
Letitia James
New York State Attorney General
Aimee Cowan
Assistant Attorney General, Of Counsel
300 S. State Street, Suite 300
Syracuse, New York 13202

*For Defendant Zaki:*
Ryan E. Manley
Ryan T. Donovan
Conway, Donovan & Manley PLLC
50 State Street, Second Floor
Albany, New York 12207

**Hon. Brenda K. Sannes, Chief United States District Judge:**

MEMORANDUM-DECISION AND ORDER

**I.     INTRODUCTION**

On March 23, 2024, Plaintiff Robert Grof initiated this action pursuant to 42 U.S.C. § 1983 alleging a claim of deliberate indifference under the Eighth Amendment against Defendants David Dinello, Marina Medved, Gerald Cahill, Wendy Frank, Anselmo Deasis, Doreen Smith, Shehab Zaki, and Carol Moores. (Dkt. No. 1).[1] Presently before the Court is Defendant Dinello's motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Dkt. No. 30). The motion is fully briefed. (Dkt. Nos. 30-1, 51, 54). For the following reasons, Defendant's motion to dismiss is granted.

**II.    FACTS**[2]

   **A.     Medications With Abuse Potential Policy**

Plaintiff, who was held in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") from 2018 to 2021, alleges that the discontinuation of his effective medication, pursuant to DOCCS policy, without an individualized assessment of his needs constitutes deliberate indifference. (Dkt. No. 1, ¶¶ 317, 324, 388–94).

DOCCS' "policy on Medications With Abuse Potential" ("MWAP") was drafted by Defendant Dinello and promulgated on June 2, 2017. (*Id.* ¶¶ 148–49).[3] On its MWAP list,

---

[1] On July 29, 2024, the parties stipulated to dismissal of Defendants Medved, Cahill, Frank, Deasis, and Smith, (Dkt. Nos. 52–53), and on September 20, 2024, the parties stipulated to dismissal of Defendant Moores, (Dkt. Nos. 62–63), leaving only Defendants Dinello and Zaki. Defendant Zaki filed an answer on June 25, 2024, (Dkt. No. 29), and the claim against him is not addressed here.

[2] These facts are drawn from the complaint. (Dkt. No. 1). The Court assumes the truth of, and draws reasonable inferences from, the well-pleaded factual allegations, *see Lynch v. City of New York*, 952 F.3d 67, 74–75 (2d Cir. 2020), but does not accept as true any legal conclusions, *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[3] The MWAP policy was codified as DOCCS Health Services Policy 1.24, "Medications with Abuse Potential." Plaintiff alleges that DOCCS allowed Defendant Dinello to draft this policy despite his lack of specialized training in addiction issues, and his guilty plea following charges in 2010 by the New York State Department of Health State

"DOCCS included a group of . . . ubiquitous medications, including" the medication at issue here: Neurontin (also known as Gabapentin), "an anticonvulsant generally taken to control seizures" and "often prescribed to relieve nerve pain." (*Id.* ¶¶ 81, 91).[4] The medications on the MWAP list "are not risk free," and "[l]ike any medication they can be abused, but many of them—including Neurontin . . . —are considered to have low addiction potential." (*Id.* ¶ 101). "DOCCS, its physicians and mid-level clinicians have been aware of the risks of these medications for decades." (*Id.* ¶ 103).

Under the MWAP policy, a provider must "submit an MWAP Request Form" to the Regional Medical Director ("RMD") in charge of their hub. (*Id.* ¶¶ 161–62). The MWAP Request Form "asked for relevant health information regarding the patient, the justification for use of the medication and a list of any alternatives tried to treat the medical issue." (*Id.* ¶ 163). The MWAP Request Form "also asked if there is any recent evidence of drug diversion or abuse by the patient." (*Id.* ¶ 164). "Based on the MWAP Request Form contents—the RMD and not the patient's medical provider—determined whether a patient will receive an MWAP." (*Id.* ¶ 167). The treating physicians and mid-level clinicians "had to discontinue an MWAP prescription if it was not approved by the RMD"; "pharmacies would not fill a prescription for an MWAP without RMD approval"; and providers "had no ability to provide the medication once an RMD refused to approve the prescription." (*Id.* ¶ 171).

The MWAP policy "had the immediate impact of abruptly discontinuing the effective treatment of hundreds of inmates on MWAPs." (*Id.* ¶ 177). "As implemented, the MWAP Policy

---

Board of Professional Medical Conduct of "failing to adequately evaluate patients prior to discharge from an emergency room." (Dkt. No. 1, ¶¶ 139–49).

[4] Although Plaintiff appears to allege that Neurontin was in a 2019 Formulary Book and was therefore available to doctors to prescribe without approval from an administrator, (Dkt. No. 1, ¶¶ 39–40, 42), Plaintiff's allegations as to the Medications With Abuse Potential policy and related customs suggest that the MWAP policy altered these practices.

3

was an almost wholesale restriction on the prescription of MWAPs, except in cases of acute need or palliative care." (*Id.* ¶ 110). This stands in contravention of the positions of several other agencies, such as the National Commission on Correctional Health Care, of which DOCCS is an accredited member, who published a position indicating that "[c]linicians should not approach the treatment of chronic pain as a decision regarding the use or nonuse of opioids (as in acute pain)[;] [r]ather clinicians should consider all aspects of the problem and all available proven modalities," and "[p]olicies banning opioids should be eschewed." (*Id.* ¶¶ 111–14). Similarly, the Federal Bureau of Prisons' ("BOP") Clinical Guideline does not prohibit use of opioids or neuromodulating medications like Neurontin but instead "lists Neurontin . . . as [a] second line treatment[] for neuropathic pain." (*Id.* ¶¶ 115–16). The American Correctional Association, by which DOCCS is accredited, "lists the BOP's Clinical Guideline . . . as its clinical guideline standard." (*Id.* ¶ 117). The New York State Department of Health "has only two main concerns regarding Neurontin/Gabapentin: it recommended avoiding prescriptions in doses higher than 3600 mg per day because there is no evidence of increase in therapeutic dose, and it recommended avoidance of use of Neurontin by a patient benefiting from concurrent opioid treatment." (*Id.* ¶ 118). The American Medical Association "also does not restrict the prescription of many of the medications on the MWAP list." (*Id.* ¶ 119). In fact, "[t]he standard in the medical community is to use medications like Neurontin . . . and other non-opioid MWAPS to treat chronic conditions to reduce the number of opioid prescriptions"; "[t]he standard in the medical community is not to restrict all effective treatment." (*Id.* ¶ 121).

      In February 2021, "as a direct result of class action litigation, DOCCS . . . rescinded the MWAP Policy and promulgated a new policy[,] 1.24A," entitled "Prescribing for Chronic Pain."

(*Id.* ¶ 289).[5] "The new policy demanded 'Pain management medication should only be discontinued after a provider has met with the patient, discussed the issues regarding the use of the medication, analyzed the patient's situation, and subsequently determined that it is in the best interest of the patient for the medication to be discontinued.[']" (*Id.* ¶ 290).

### B.     Plaintiff's Medical Issues

Plaintiff, who is 56 years old, suffers from severe back problems, including pain in his head, neck, and back. (*Id.* ¶¶ 317–18, 323). In 2011, he underwent back surgery for cervical decompression and spinal implants and in 2012, he further underwent spinal fusion and laminectomy with implant surgery. (*Id.* ¶¶ 319–20). In 2014, MRIs showed paracentral herniation and nerve impingement. (*Id.* ¶ 322). He uses a cane to assist with walking. (*Id.* ¶ 321). When Plaintiff came into DOCCS' custody in 2018 at Ulster Reception, he had an active Neurontin prescription. (*Id.* ¶¶ 324–25).

"When a patient is first 'drafted in' to DOCCS he/she generally resides at a reception facility until staff conducts a medical assessment and a department called 'Movement and Classification' determines the best housing for the patient." (*Id.* ¶ 73). The medical staff at a reception facility maintain a patient on all the medications and prescriptions they were taking before being "drafted in" to ensure continuity of care. (*Id.* ¶ 74). "The medical staff at the reception facility conduct a thorough individualized assessment of the patient's health issues for use by practitioners in receiving facilities[,] [and] [t]heir findings related to major disease or mobility issues are entered into the patient's Medical Problem List." (*Id.* ¶ 75). Upon transfer to a facility for housing, "a nurse is supposed to conduct an 'assessment[]' of the patient," and if a

---

[5] Plaintiff appears to be referring to class-action litigation in the Southern District of New York challenging the MWAP policy. *See Allen v. Koenigsmann*, No. 19-cv-8173 (S.D.N.Y.).

5

"prisoner needs medications prescribed, a medical provider is given the medication list to review for ordering." (*Id.* ¶ 76).

Plaintiff's "infirmary admission records on December 5, 2018 diagnosed him with hypertension, glaucoma, and spinal stenosis, and noted his current prescription of Neurontin." (*Id.* ¶ 326). On or around December 12, 2018, Plaintiff was transferred to Franklin Correctional Facility. (*Id.* ¶ 327). There, a medical provider "discontinued his Neurontin prescription and prescribed Elavil," without recording a reason for the discontinuation. (*Id.* ¶¶ 327–28). Ten days after his Neurontin was discontinued, on January 10, 2019,[6] Plaintiff "reported heart palpitations, claiming they arise when his neuropathy 'acts up.'" (*Id.* ¶ 329). Two days later, he was admitted to a medical center for heart palpitations. (*Id.* ¶ 330). During his stay, providers discontinued Elavil and the palpitations ceased. (*Id.* ¶ 331). "The discharge summary stated, 'discuss change back to gabapentin for neuropathic pain at previous dose.'" (*Id.* ¶ 331). Nevertheless, DOCCS providers did not submit an MWAP request form requesting that Defendant Dinello, the assigned RMD, allow the prescription of Neurontin. (*Id.* ¶¶ 17, 155, 332).

On January 16, 2019, Plaintiff's healthcare proxy wrote to the Medical Director at Franklin Correctional Facility, requesting that Plaintiff's Neurontin be resumed. (*Id.* ¶ 333). On January 28, 2019, Plaintiff began complaining of neuropathy in both hands, and asked to see the doctor to discuss his ongoing neuropathy in his left leg. (*Id.* ¶ 334). In February 2019, Plaintiff reported to sick call, complained of pain and other symptoms, and was prescribed aspirin. (*Id.* ¶ 335–36). In response to an inmate grievance he submitted in February 2019 regarding specialist pain medication recommendations not being followed, the Grievance Committee "informed him

---

[6] The Complaint states that the Neurontin was discontinued ten days before "January 10, 2020." (Dkt. No. 1, ¶ 329). However, the Complaint also says that the order to discontinue Neurontin within three weeks was given in December 2018. (*Id.* ¶¶ 327–28). Given the timeline in the Complaint setting forth Plaintiff's experience, the Court assumes that Neurontin was actually discontinued ten days before January 10, 2019.

6

that any medications must be approved by the regional medical director and that outside treating doctors can only suggest medications." (*Id.* ¶ 338). Plaintiff appealed, and the Superintendent "determined his grievance had no merit, and cited to the MWAP Policy 1.24 as evidence supporting the original decision that a Regional Medical Director must approve all medications subject to the policy." (*Id.* ¶¶ 339–40). At this point, Plaintiff's medical providers had not asked Defendant Dinello to approve the Neurontin. (*Id.* ¶ 341).

Over the next few months, Plaintiff's pain worsened and he told medical providers it "was because he was not receiving any medication to treat his neuropathy," but the medical providers did not take action to help him. (*Id.* ¶¶ 343–44). In June 2019, Plaintiff began physical therapy, and at the end of that course of treatment, he was seen by a pain management doctor in October 2019 who recommended that Plaintiff be placed on Neurontin. (*Id.* ¶¶ 345–47). Nevertheless, Plaintiff still was not prescribed Neurontin, and there is no documented rationale. (*Id.* ¶¶ 348–49). Plaintiff again wrote to the Grievance Committee on November 28, 2019 "to complain that he [wa]s not being provided effective medical care." (*Id.* ¶ 350). The Committee's response "again reiterated the direction of the MWAP Policy." (*Id.* ¶ 351). Plaintiff appealed, and the appeal was denied on December 23, 2019, again with citation to the MWAP Policy. (*Id.* ¶¶ 352–53).

On February 4, 2020, Plaintiff's treating physician submitted an MWAP Request for Neurontin. (*Id.* ¶ 354). Defendant Dinello denied the request, "concluding that there was insufficient medical justification to prescribe Neurontin." (*Id.*). Defendant Dinello suggested other treatments, even though Plaintiff was already receiving those treatments, and made no comment on the pain specialist recommendation. (*Id.* ¶ 355).

Plaintiff was subsequently transferred to Upstate Correctional Facility in March 2020 and his new medical providers did nothing to treat his stenosis and neuropathy, denied him effective medication and treatment, and failed to submit an MWAP Request Form. (*Id.* ¶¶ 360–68). At some point, a nurse practitioner trialed him on a new medication as an alternative to Neurontin, but it was ineffective. (*Id.* ¶ 369). Plaintiff was then transferred to Greene Correctional Facility, and the medical provider there similarly failed to submit an MWAP Request Form. (*Id.* ¶¶ 370, 372). In September 2020, Plaintiff was transferred to Marcy Correctional Facility, and the medical provider there conducted an "MWAP Reassessment" on October 19, 2020 and concluded that Plaintiff "'appear[ed]' stable on 'Relafen, a tens unit and a back brace.'" (*Id.* ¶ 374). The provider did nothing to reinstate the Neurontin. (*Id.* ¶¶ 375, 377). After increasing symptoms and pain, the provider reinstated a prescription of Neurontin for Plaintiff on March 23, 2021. (*Id.* ¶¶ 379–385). On April 1, 2021, Plaintiff was transferred to Mohawk Correctional Facility and his Neurontin prescription was continued. (*Id.* ¶ 386). Plaintiff has since been released from DOCCS custody and his outside medical providers have continued his pain management medications, including Neurontin. (*Id.* ¶ 387).

Plaintiff alleges that he "was a victim of [a] grand plan" that involved certain DOCCS medical administrators determining "to remove certain medications from DOCCS[] facilities—not based on patients' needs or efficacy—but the perceived 'abuse potential' of the medication." (*Id.* ¶¶ 389, 392). "If patients like [Plaintiff] had the misfortunate [sic] to be housed in facilities within [Defendant] Dinello's [region], their medications were discontinued by providers—sometimes just at transfer, or for unconfirmed reports by security of diversion attempts, or because facilities did not 'give that here.'" (*Id.* ¶ 390). Plaintiff alleges that "DOCCS' Central Office started marking each facility's ability to get their patients off the medications" and that

"[d]iscontinuations were done without medical justification or individualized assessments." (*Id.* ¶ 391). Plaintiff "repeatedly and consistently reported his pain and suffering to no avail," and Plaintiff "suffered severely for over three years due to Defendant's adherence to the[se] customs, policies and practices." (*Id.* ¶¶ 393–94).

### III.   LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Although a complaint need not contain detailed factual allegations, it may not rest on mere labels, conclusions, or a formulaic recitation of the elements of the cause of action, and the factual allegations 'must be enough to raise a right to relief above the speculative level.'" *Lawtone-Bowles v. City of New York*, No. 16-cv-4240, 2017 WL 4250513, at *2, 2017 U.S. Dist. LEXIS 155140, at *5 (S.D.N.Y. Sept. 22, 2017) (quoting *Twombly*, 550 U.S. at 555). A court must accept as true all well-pleaded factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See EEOC v. Port Auth.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

### IV.   DISCUSSION

####   A.   Statute of Limitations

Defendant argues that Plaintiff's claim is time-barred and must therefore be dismissed. (Dkt. No. 30-1, at 9–12). Plaintiff argues that he is entitled to application of the continuing violation doctrine. (Dkt. No. 51, at 9–10). In reply, Defendant argues that Plaintiff has not

alleged acts of Defendant within the relevant period that would render the continuing violation policy applicable. (Dkt. No. 54, at 4–8).

"The statute of limitations for § 1983 actions arising in New York is three years." *Lucente v. County of Suffolk*, 980 F.3d 284, 308 (2d Cir. 2020); *see also Shomo v. City of New York*, 579 F.3d 176, 181 (2d Cir. 2009) ("The statute of limitations for claims brought under Section 1983 is governed by state law, and [for an Eighth Amendment deliberate indifference claim] is the three-year period for personal injury actions under New York State law."). "A Section 1983 claim ordinarily 'accrues when the plaintiff knows or has reason to know of the harm.'" *Shomo*, 579 F.3d at 181 (quoting *Eagleston v. Guido*, 41 F.3d 865, 871 (2d Cir. 1994)).

However, the "continuing violation doctrine is an 'exception to the normal knew-or-should-have-known accrual date,'" *id.* (quoting *Harris v. City of New York*, 186 F.3d 243, 248 (2d Cir. 1999)), which the Second Circuit has applied to Eighth Amendment deliberate indifference claims, *see Williams v. Annucci*, No. 20-cv-1417, 2021 WL 4775970, at *3, 2021 U.S. Dist. LEXIS 196917, at *8–9 (N.D.N.Y. Oct. 13, 2021) (collecting cases). The continuing violation doctrine "applies to claims 'composed of a series of separate acts that collectively constitute one unlawful [] practice.'" *Gonzalez v. Hasty*, 802 F.3d 212, 220 (2d Cir. 2015) (alteration in original) (quoting *Washington v. County of Rockland*, 373 F.3d 310, 318 (2d Cir. 2004)). "To assert a continuing violation for statute of limitations purposes" in the context of an Eighth Amendment claim for deliberate indifference, "the plaintiff must 'allege both the existence of an ongoing policy of [deliberate indifference to his or her serious medical needs] and some non-time-barred acts taken in the furtherance of that policy.'" *Shomo*, 579 F.3d at 182 (alteration in original) (quoting *Harris*, 186 F.3d at 250). This is because "[w]hen the plaintiff brings a Section 1983 claim challenging a . . . policy [of deliberate indifference], 'the

10

commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it.'" *See id.* at 181 (quoting *Cornwell v. Robinson*, 23 F.3d 694, 703 (2d Cir. 1994)). The continuing violation doctrine does not, however, apply to "discrete unlawful acts, even where those discrete acts are part of 'serial violations.'" *See Lucente*, 980 F.3d at 309 (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114–15 (2002)).

"Although the statute of limitations is ordinarily an affirmative defense that must be raised in the answer, a statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint." *See Conn. Gen. Life Ins. Co. v. BioHealth Labs., Inc.*, 988 F.3d 127, 131–32 (2d Cir. 2021) (quoting *Thea v. Kleinhandler*, 807 F.3d 492, 501 (2d Cir. 2015)). In the context of an alleged continuing violation, if a plaintiff alleges "some [] act that did occur within the statute of limitations, so that his claim would not be time-barred," *Harris*, 186 F.3d at 250, and "[t]he complaint suggests a pattern" of deliberately indifferent treatment, *see Shomo*, 579 F.3d at 182, an Eighth Amendment claim for deliberate indifference can withstand a challenge for failure to state a claim. Where a plaintiff brings a claim against multiple defendants, the plaintiff must allege a non-time-barred act as to each defendant. *See id.* at 183 ("The continuing violation doctrine does not apply to the claim against [the individual defendant] because there is no indication that [the plaintiff] is able to allege acts involving [that defendant] that fall within the three-year statutory period."); *Lucente*, 980 F.3d at 310 (holding that Section 1983 claims could proceed against certain individual defendants "as long as each plaintiff alleged an unconstitutional act committed by each particular defendant that falls within the three-year statutory period").

Here, the only allegation involving an affirmative act by Defendant Dinello is his denial of the MWAP Request for Neurontin on February 4, 2020. (Dkt. No. 1, ¶ 354). This act occurred

11

before March 23, 2021, the earliest day of the three-year period ending on the date on which Plaintiff filed his complaint. It therefore falls outside the statute-of-limitations period. Furthermore, even if Plaintiff did allege a continuing violation, the only alleged acts occurring on or after March 23, 2021 were the reinstatement and continuation of Plaintiff's Neurontin prescription. (*Id.* ¶¶ 385–86). Plaintiff has not alleged *any* unlawful acts occurring on or after March 23, 2021. Plaintiff argues that Dinello was aware of patients' suffering and the unhappiness of DOCCS' medical providers and should have "followed up with patients whose medications were discontinued, including [Plaintiff]." (Dkt. No. 51, at 10). But Plaintiff's prescription was reinstated on March 23, 2021. (Dkt. No. 1, ¶ 385). And there is no act alleged involving Defendant Dinello that falls within the three-year statutory period. Thus, Plaintiff's complaint is untimely, and, accordingly, Defendant's motion to dismiss is granted.

    **B.**    **Leave to Amend**

In response to Defendant's motion to dismiss, Plaintiff requests leave to amend. (Dkt. No. 51, at 10). Defendant seeks dismissal of the complaint with prejudice. (*See* Dkt. No. 54).

Under Federal Rule of Civil Procedure 15(a), absent certain circumstances not at play here, a party may amend its pleading only with the opposing party's written consent or the court's leave. *See* Fed. R. Civ. P. 15(a)(1)–(2). Rule 15(a)(2) requires that a court "freely give leave when justice so requires." *See McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). But a court may, in its discretion, deny leave to amend "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *MSP Recovery Claims, Series LLC v. Hereford Ins. Co.*, 66 F.4th 77, 90 (2d Cir. 2023).

Here, Plaintiff has not identified any basis for an amendment or any additional facts he could plead in an amended complaint. The Complaint alleges that Plaintiff had access to

Neurontin as of March 23, 2021. (Dkt. No. 1, ¶¶ 385–86). Accordingly, the Court finds that amendment would be futile, and denies Plaintiff's request for leave to amend the complaint.

## V.   CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendant's motion to dismiss under Rule 12(b)(6), (Dkt. No. 30), is **GRANTED**; and it is further

**ORDERED** that the complaint, (Dkt. No. 1), is **DISMISSED** as to Defendant David Dinello.

**IT IS SO ORDERED.**

Dated: January 15, 2025
Syracuse, New York

*Brenda K. Sannes*
Brenda K. Sannes
Chief U.S. District Judge